PACIFIC TRIAL ATTORNEYS
A Professional Corporation
Scott J. Ferrell, Bar No. 202091
sferrell@pacifictrialattorneys.com
Victoria C. Knowles, Bar No. 277231
vknowles@pacifictrialattorneys.com
4100 Newport Place Drive, Ste. 800
Newport Beach, CA 92660
Tel: (949) 706-6464
Fax: (949) 706-6469

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CIEARA MUNOZ, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CONSTELLATION ENERGY CORPORATION, a Pennsylvania corporation; CONSTELLATION NEWENERGY, INC., a Delaware corporation; and DOES 1 through 20, inclusive,<br><br>Defendant. | Case No. '26CV5359 BAS MMP<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>**(1) VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT, CAL. PENAL CODE § 631(a);**<br><br>**(2) VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT, 18 U.S.C. §§ 2510 et seq.;**<br><br>**(3) INTRUSION UPON SECLUSION; AND**<br><br>**(4) VIOLATION OF CALIFORNIA CONSTITUTION, ARTICLE I, § 1** |

# I. INTRODUCTION

1. This is a privacy class action about a simple promise and a deliberate betrayal of that promise. Defendants operate the consumer-facing website WWW.CONSTELLATION.COM (the "Website"). The Website presents visitors with a privacy banner that offers a choice to reject non-essential cookies and tracking. Plaintiff Cieara Muñoz exercised that choice. She selected the option to reject non-essential tracking. The Website nevertheless continued to cause her browser, and the browsers of similarly situated visitors, to communicate with outside advertising, analytics, and data-broker systems.

2. The challenged conduct is not limited to a cookie sitting passively on a device. Technical testing of the Website shows live browser-side transmissions to independent third parties, including HubSpot, Adobe, and Google/DoubleClick. Those transmissions reveal the substance and context of a visitor's interaction with Constellation, including page URLs, user-entered search or form terms placed into URLs, advertising and marketing identifiers, device and browser information, session information, and other behavioral data. The Website causes those transmissions to occur automatically as pages load and as visitors interact with the Website.

3. The testing is particularly significant because the Website does this both before any effective consent and after an express rejection. Before consent, Adobe Advertising Cloud and Adobe Audience Manager install tracking technologies and assign persistent identifiers. After rejection, previously deposited tracking technologies persist and outside services continue to receive information about the pages and actions the visitor selects. The consent mechanism therefore does not merely fail at the margins. It affirmatively represents that a visitor can reject non-essential tracking while the Website's underlying code continues the same commercial surveillance.

4. The report documents an especially concrete example. The Website asks visitors to enter a ZIP code to explore residential energy plans. The Website then places that user-supplied ZIP code directly into the resulting URL. Third-party services,

including HubSpot, Adobe Target, and Google Ads Remarketing, receive the resulting page URL. Thus information a visitor communicates to Constellation through Constellation's own form becomes part of a browser communication that Constellation causes to be contemporaneously transmitted to outside companies.

5. The architecture is designed for commercial exploitation. Adobe Advertising Cloud uses device identifiers, IP addresses, and browsing behavior to recognize users and associate them with advertising profiles, and the report explains that those identifiers are shared with ad exchanges, demand-side platforms, and data partners for cross-site tracking, audience targeting, and programmatic advertising. Adobe Audience Manager uses "demdex" and "dpm" identifiers to link a visitor's Website activity to an existing profile. Google/DoubleClick stores an IDE cookie for approximately thirteen months so the same person or browser can be recognized across sessions.

6. Defendants' own public privacy disclosures confirm that this is a data-monetization system, not merely a technical necessity for delivering the Website. Defendants state that they collect online identifiers, device identifiers, cookies, beacons, pixel tags, browsing history, search history, Website-interaction information, and geolocation information. They further disclose that categories of identifiers, unique personal identifiers, and geolocation data are sold or shared with advertising networks and data-analytics providers. That commercial sale and sharing of intercepted visitor information is an independently tortious objective, separate from the act of interception itself, and is central to Plaintiff's claim under the federal Electronic Communications Privacy Act ("ECPA").

7. Plaintiff does not contend that ordinary Internet routing or a first-party Website log is unlawful. The claims concern something different: Defendants intentionally embedded third-party code that creates additional communications to independent commercial recipients, permits those recipients to acquire the communications in real time, links the communications to persistent advertising identities, and uses the resulting information for behavioral advertising, audience building, cross-site

tracking, retargeting, and data commercialization even after the visitor has expressly rejected non-essential tracking.

8. The August 21, 2026 tentative ruling in Variety Media, LLC v. Superior Court, No. B350578, is consistent with the basic premise underlying this action: Internet communications are not categorically outside the California Invasion of Privacy Act ("CIPA"). Although Variety Media addressed a different CIPA provision and remains a tentative ruling, it rejects the broad proposition that CIPA simply stops applying because a communication occurs through a web browser rather than a traditional telephone line. This Complaint proceeds under section 631(a), based on acquisition of the contents and meaning of Internet communications while they are in transit.

## II. **PARTIES**

9. Plaintiff CIEARA MUÑOZ is a natural person and resident of California. On May 4, 2026, while genuinely researching electricity services, Plaintiff arrived at WWW.CONSTELLATION.COM. The Website presented a box that allowed her to reject cookies and tracking. Plaintiff selected the rejection option and then continued to browse and click on Website content. Plaintiff did not authorize Defendants, HubSpot, Adobe, Google/DoubleClick, or any other outside advertising or data-broker company to intercept, acquire, sell, share, or commercially exploit the contents of her Website communications.

10. After Plaintiff's visit, she began observing advertisements corresponding to subjects and items she had viewed. She was unsettled to learn that the Website had continued commercial tracking after representing that she could reject such tracking. Plaintiff suffered a loss of privacy and control over her browsing communications and personal information and an unwanted disclosure of information about her Website activity to independent third parties.

11. Defendant CONSTELLATION ENERGY CORPORATION ("Constellation Energy") is a corporation headquartered in Baltimore, Maryland. It owns, controls, operates, or participates in the operation of the Constellation family of energy businesses

and the Website and publicly describes its privacy practices as applying to Constellation Energy Corporation and its subsidiaries and affiliated companies.

12. Defendant CONSTELLATION NEWENERGY, INC. ("Constellation NewEnergy") is a Constellation affiliate that publicly uses the "Constellation" name and WWW.CONSTELLATION.COM in connection with its retail energy business. Public Website materials identify Constellation NewEnergy as one of the entities whose services and online privacy practices are covered by Constellation's Website policies. Plaintiff alleges on information and belief that Constellation NewEnergy owns, controls, operates, directs, benefits from, or participates in the consumer-facing Website functions challenged here.

13. Constellation Energy and Constellation NewEnergy are referred to collectively as "Constellation" or "Defendants." Plaintiff alleges that each Defendant participated in, authorized, controlled, implemented, benefited from, or ratified the Website tracking architecture and privacy representations alleged herein. The precise allocation of responsibility among the Constellation entities, their website operators, and their vendors is uniquely within Defendants' possession and will be refined through discovery.

14. Plaintiff is ignorant of the true names and capacities of DOES 1 through 20 and therefore sues them by fictitious names. Plaintiff will amend this Complaint when their identities and roles in the challenged tracking, interception, sale, sharing, data-broker relationships, and consent-management architecture are discovered.

## III. <u>JURISDICTION, PERSONAL JURISDICTION, AND VENUE</u>

15. This Court is a court of general jurisdiction under Article VI, section 10 of the California Constitution and has jurisdiction over Plaintiff's California statutory, constitutional, and common-law claims. This Court also has concurrent jurisdiction over Plaintiff's civil claim under ECPA, 18 U.S.C. §§ 2510 et seq. and 2520, because Congress did not vest exclusive jurisdiction over that private civil remedy in the federal courts.

16. Defendants are subject to personal jurisdiction in California because they deliberately conduct substantial energy, commercial, advertising, and digital operations directed to California residents; maintain a California-facing Website and privacy policy; collect and monetize information from California visitors; and intentionally deploy the challenged tracking technologies to California devices. The challenged interception and disclosure arise directly from those California-directed activities.

17. Constellation NewEnergy has long conducted regulated and commercial energy activities in California and has appeared before California energy regulators. Defendants solicit California business, provide energy-related services in California, and operate the same Website and tracking systems used to acquire information from California visitors. The location of a visitor is commercially relevant to Defendants because energy offerings, utility territories, service eligibility, pricing, and regulatory requirements are inherently geographic.

18. Venue is proper in San Diego County because Defendants are not domiciles of California.

## IV. <u>FACTUAL ALLEGATIONS</u>

### A. THE WEBSITE PROMISES A MEANINGFUL RIGHT TO REJECT NON-ESSENTIAL TRACKING

19. The Website displays a consent-management banner that distinguishes necessary functionality from non-essential advertising and tracking. The interface allows the visitor to choose "Reject All" or an equivalent rejection option. A reasonable consumer understands that selecting that option means advertising, retargeting, audience-building, and data-broker technologies that are not necessary to deliver the requested page will not be deployed against that visitor.

20. Plaintiff exercised that choice. She rejected cookies and tracking before continuing to browse. Her choice was affirmative, specific, and unambiguous. She did not click "Accept All." She did not opt into advertising cookies. She did not knowingly authorize Defendants to create additional browser communications to HubSpot, Adobe,

Google, DoubleClick, or data partners for behavioral advertising, retargeting, profiling, cross-site recognition, sale, or sharing.

21. The Website records rejection through an OptanonConsent cookie. The technical report captures a consent state reflecting rejection of non-essential categories. The existence of that record demonstrates that the Website knew the visitor had refused the challenged categories. Yet the tracking continued.

**B. THIRD-PARTY TRACKING BEGINS BEFORE AN EFFECTIVE OPPORTUNITY TO CONSENT**

22. Network analysis shows third-party requests begin immediately when a first-time visitor loads the Website, before the visitor has an effective opportunity to grant or deny consent. The browser retrieves third-party scripts, tag-management components, pixels, and advertising resources that execute client-side and transmit technical and behavioral information to external servers.

23. Adobe Advertising Cloud operates before consent. It is a programmatic advertising platform used to identify visitors and build advertising audiences across websites and applications. The report documents collection of device identifiers, IP addresses, and browsing behavior used to recognize a visitor and associate the visitor with advertising profiles. The platform stores third-party tracking cookies for approximately 365 days.

24. Adobe Audience Manager likewise operates before consent. It gathers Website-user information to build behavioral profiles and place users into advertising audiences. It collects IP addresses at the start of sessions for geolocation and uses Demdex.net cookies to assign tracking IDs and record online activity. The "demdex" identifier is used to identify a specific user and link Website activity to an existing visitor profile. The "dpm" identifier is used to match the visitor to a data-provider profile. Those identifiers persist for approximately 180 days.

25. These systems are unnecessary to transmit the Website page requested by the visitor. A visitor can receive the Website's ordinary content without Adobe building a

cross-site advertising profile. Their presence before consent reflects a deliberate design choice to initiate commercial surveillance first and ask permission second.

**C. REJECTION DOES NOT STOP THE TRACKING**

26. After a visitor rejects non-essential cookies, cookies deposited before the rejection remain in the browser and outside tracking services continue to execute. The report identifies post-rejection acquisition by HubSpot, Adobe Target, and Google Ads Remarketing, among others. Those systems receive Website interaction information even though the visitor has expressly said no to non-essential tracking.

27. The continued tracking is not an unavoidable technical consequence of previously cached Website content. Defendants control which scripts are embedded, when they execute, which consent categories they are assigned to, whether their network calls are suppressed after a rejection signal, and whether previously deposited identifiers are deleted or disabled. Modern consent-management systems are specifically designed to gate those technologies. The continued transmissions therefore reflect configuration choices attributable to Defendants and their vendors.

**D. THE ZIP-CODE FLOW DEMONSTRATES ACQUISITION OF COMMUNICATION CONTENT**

28. The Website asks visitors to enter a ZIP code to explore residential energy plans. When a visitor provides that information, the Website inserts the user-supplied ZIP code into the query string of the resulting page URL. The technical report records the representative path "/solutions/for-your-home/residential-signup.html?zip=90001&offerCode=rockstar."

29. The ZIP code is not generated by an advertising company. It originates with the visitor and is communicated to Constellation in response to Constellation's own prompt. Once embedded in the URL, it remains part of the content and meaning of the Website communication: it tells the recipient the geographic market the visitor asked Constellation to evaluate and the offer flow the visitor entered.

30. Third-party services then receive the page URL containing that user-entered information. The report identifies HubSpot, Adobe Target, and Google Ads Remarketing among the recipients. The communication is therefore duplicated: one path requests content from Constellation, while additional browser-side code causes information describing that request—including user-entered content—to be sent to outside commercial recipients.

**E. HUBSPOT RECEIVES PAGE URLS AND USER-ENTERED TERMS**

31. The report captures HTTP requests sent from the visitor's browser to HubSpot servers. Those requests track visitor activity and collect the page URL viewed, including user-entered search or form information contained in the URL. A HubSpot-domain cookie is then stored in the browser as part of that interaction.

32. HubSpot is an independent commercial recipient. It is not Defendants' web server and is not necessary to route the visitor's request to Constellation. Defendants cause the browser to contact HubSpot by embedding HubSpot-related code or tags in the Website. HubSpot receives the information at its own endpoint and can process it for analytics, marketing, customer-management, and related commercial purposes.

**F. ADOBE TARGET RECEIVES THE PAGE URL AND A PERSISTENT MARKETING IDENTITY**

33. Adobe Target is used to customize content and messaging across digital properties. The captured Adobe Target request contains the Constellation page URL, an Adobe Marketing Cloud visitor identifier, and server-side analytics information. The Marketing Cloud visitor identifier is also stored as first-party cookie data.

34. This architecture associates the substance of the Constellation interaction with a persistent Adobe-recognized identity. A page path or ZIP-code-bearing URL becomes materially more revealing when tied to an identifier that can recognize the same browser or profile later. The resulting combination allows the recipient to know both what the visitor was doing on Constellation's Website and which persistent digital identity performed that action.

## G. GOOGLE ADS/DOUBLECLICK PERFORMS REAL-TIME REMARKETING SURVEILLANCE

35. Google Ads Remarketing operates through browser requests to Google/DoubleClick when Website pages load. The report explains that the resulting web beacons can identify the specific page view, the specific web session, the individual user or persistent advertising identity, the device, the browser and version, and the precise time of the visit.

36. Google extends recognition beyond the single page load by storing the IDE advertising cookie on the visitor's browser for approximately thirteen months. The purpose of that persistence is remarketing: recognizing a visitor who previously interacted with the Website so that targeted advertisements can later be delivered and campaign performance can be measured.

37. Plaintiff's own experience is consistent with this architecture. After rejecting tracking and browsing the Website, she later observed advertising corresponding to subjects she had viewed. The report provides the technical mechanism by which such retargeting occurs.

## H. THE INTERCEPTION OCCURS CONTEMPORANEOUSLY WHILE THE COMMUNICATION IS IN TRANSIT

38. The challenged acquisition occurs in real time in the browser. When a visitor requests or interacts with a Website page, the browser constructs and transmits network requests. Defendants' embedded client-side code causes additional requests to independent third-party endpoints during that same page-load and interaction sequence.

39. The outside recipient acquires the communication at its own endpoint while the browser is processing and transmitting the Website interaction. The acquisition is not limited to later retrieval of a stored record from Constellation's server. HubSpot, Adobe, and Google receive their own browser-generated requests as the interaction occurs. Their receipt is therefore contemporaneous with the Website communication and occurs while the communication is in electronic transmission.

40. HTTPS encryption does not alter that architecture. Encryption protects data between endpoints from unrelated network observers. It does not prevent an intended endpoint such as Adobe or Google from reading the request sent directly to it. Defendants' code makes those companies endpoints of the additional communications.

**I. THE THIRD PARTIES ACQUIRE CONTENT, NOT MERELY ROUTING INFORMATION**

41. The intercepted information includes the contents and meaning of communications because it identifies the particular page, service, offer flow, or search/form information the visitor requested from Constellation. A URL identifying a residential-energy signup page, together with a ZIP code the visitor entered, communicates substantive information about what the visitor asked Constellation to provide.

42. The content is enriched by persistent identifiers, timestamps, session information, device and browser characteristics, referrers, and advertising IDs. Those fields allow the outside recipient to place the substantive interaction into a durable profile, connect multiple events to the same person or browser, infer interests, segment the visitor, measure conversions, and target future advertisements.

43. The commercial value of the information confirms its communicative meaning. Defendants and their advertising partners do not maintain year-long identifiers because raw packet routing is valuable. They maintain those identifiers because a record that a recognized visitor searched for or interacted with a particular energy product, location, offer, or service can be monetized through targeting, audience creation, measurement, sale, and sharing.

**J. THE RECIPIENTS ARE INDEPENDENT THIRD PARTIES WITH THEIR OWN COMMERCIAL PURPOSES**

44. HubSpot, Adobe, Google/DoubleClick, advertising exchanges, demand-side platforms, analytics providers, and data partners are independent commercial enterprises. They are not extensions of Plaintiff, and they are not passive conduits required to connect

Plaintiff's browser to Constellation. Each maintains its own infrastructure, identifiers, products, customers, data-processing systems, and economic interests.

45. The report expressly describes Adobe Advertising Cloud identifiers as being shared with ad exchanges, demand-side platforms, and data partners to enable cross-site tracking, audience targeting, and programmatic advertising. Adobe Audience Manager exists to build behavioral profiles and targeted audiences. Google's IDE cookie exists to recognize visitors across sessions for remarketing. Those functions are independent uses of the acquired information.

46. Defendants' own privacy disclosures likewise acknowledge selling or sharing categories of personal information—including online identifiers, device-related identifiers, and geolocation information—to advertising networks and data-analytics providers. These disclosures corroborate that the challenged data leaves the first-party Constellation relationship and is commercially distributed to independent entities.

## K. THE DATA-BROKER SALE AND SHARING IS AN INDEPENDENTLY TORTIOUS PURPOSE

47. ECPA provides a limited exception in certain circumstances where one party to a communication consents to an interception. That exception does not protect an interception undertaken for the purpose of committing a criminal or tortious act. Plaintiff alleges that, even apart from the interception itself, Defendants deployed the challenged architecture for independently tortious purposes.

48. First, Defendants used the privacy interface to induce visitors to continue communicating under the representation that non-essential tracking could be rejected, while configuring the Website so that commercial tracking persisted. That deliberate privacy misrepresentation induced the transmission of communications the visitor otherwise would have withheld or altered. The resulting conduct constitutes an independently wrongful invasion of privacy and intrusion into private affairs.

49. Second, Defendants acquired Website communications for the separate purpose of selling, sharing, disclosing, and commercially exploiting visitor information

through advertising networks, data-analytics providers, data partners, audience-management systems, and data-broker relationships. The sale or sharing is a later commercial use and disclosure separate from the initial act of interception. It deprives visitors of control over information they expressly declined to provide for non-essential tracking purposes and exposes the information to additional parties and uses.

50. Third, the data-broker purpose is independently tortious because it intentionally interferes with the visitor's legally protected privacy interest and seclusion after an express rejection. A visitor who clicks "Reject All" has communicated that advertising and profiling entities should not receive or use her Website activity for non-essential purposes. Deliberately overriding that choice and distributing the resulting information for profiling, cross-site tracking, retargeting, and audience monetization is a separate invasion of the visitor's private affairs.

51. Fourth, the data-broker purpose is not incidental. The long-lived identifiers, audience-management tools, demand-side-platform sharing, remarketing infrastructure, and Defendants' own disclosures concerning sale or sharing show that commercial dissemination is an objective of the system. The interception is valuable precisely because the information can be transformed into an advertising identity, audience segment, behavioral profile, or monetizable data record.

52. Accordingly, even if Defendants contend that they were parties to Plaintiff's direct communications with the Website, the ECPA claim remains independently viable because the challenged acquisition was undertaken for the purpose of committing separate tortious invasions of privacy and commercial sale, sharing, and exploitation of communications contrary to the visitor's express privacy choice.

## L. DEFENDANTS INTENTIONALLY ENABLED, CONTROLLED, AND BENEFITED FROM THE TRACKING

53. The third-party transmissions are not random features of the public Internet. They occur because Defendants selected, embedded, configured, or authorized third-party tags, scripts, pixels, SDK-like components, tag-management rules, and consent categories

on the Website. Those components would not execute from a visitor's browser absent Defendants' Website code and configuration.

54. Defendants can determine when a tag loads, whether a tag is categorized as essential or non-essential, whether a rejection signal suppresses the tag, what parameters are populated into an outbound request, which vendors receive the request, and whether identifiers persist after rejection. Defendants also can remove the integrations entirely. The resulting acquisition is therefore caused and procured by Defendants.

55. Defendants receive substantial commercial value in return. The tracking permits attribution of advertising campaigns, identification of high-value prospective customers, geographic segmentation, retargeting, audience building, conversion measurement, content personalization, and optimization of future marketing spend. Defendants therefore have both knowledge of and a direct economic incentive for the challenged third-party acquisition.

56. The consent banner itself demonstrates knowledge. Defendants recognize that advertising and tracking technologies are sufficiently distinct from necessary Website functionality that visitors are offered a choice about them. Having made that distinction and received a rejection, Defendants cannot plausibly characterize the continued non-essential tracking as an accidental or unavoidable feature of providing the requested page.

## M. PLAINTIFF'S MAY 2026 ENCOUNTER

57. On May 4, 2026 at approximately 9:35 a.m., Plaintiff was searching online for electricity-related information and arrived at WWW.CONSTELLATION.COM. Her visit was genuine. She was interested in the energy information and services presented there and did not visit merely to generate litigation.

58. The Website presented a box allowing Plaintiff to reject cookies and tracking. Plaintiff did so. She then clicked on Website content and continued browsing with the reasonable understanding that Defendants would honor the privacy choice they had just presented.

59. Plaintiff did not expect that the rejection control was illusory. She did not expect Defendants to continue causing her browser to communicate her Website activity to independent advertising, analytics, and data-broker systems. Had Defendants truthfully disclosed that non-essential commercial tracking would continue regardless of the rejection, Plaintiff would have altered her browsing behavior, withheld communications, or left the Website.

60. Plaintiff later observed advertisements concerning subjects corresponding to items she had viewed. She became concerned that Defendants had tracked her despite the express rejection. The forensic testing of the Website confirms that the concern was well founded: the standardized Website architecture initiates commercial third-party tracking before consent and continues material tracking after rejection.

61. Plaintiff was offended, disturbed, and deprived of control over her communications and personal information. She suffered an invasion of privacy at the moment her communications were secretly copied and transmitted to outside commercial recipients and suffered a further invasion when those recipients and their partners were enabled to retain, profile, share, sell, synchronize, and use the information for advertising and behavioral purposes.

## V. CLASS ACTION ALLEGATIONS

62. Plaintiff brings this action pursuant to Code of Civil Procedure section 382 on behalf of herself and all other persons similarly situated.

63. Plaintiff proposes the following California Tracking Class: All natural persons who, while located in California during the applicable limitations period, visited WWW.CONSTELLATION.COM, rejected non-essential cookies or tracking through the Website's privacy interface, and whose Website communications were thereafter caused by Defendants to be contemporaneously transmitted to one or more non-essential third-party advertising, analytics, audience-management, remarketing, or data-broker recipients.

64. Plaintiff also proposes an ECPA Subclass consisting of members of the California Tracking Class whose electronic communications were intercepted, procured, disclosed, or used in violation of 18 U.S.C. § 2511 and who are entitled to relief under 18 U.S.C. § 2520.

65. Excluded from the Class are Defendants; their officers, directors, and employees; any entity in which Defendants have a controlling interest; the judicial officer assigned to this case and members of that officer's immediate family; and any person who timely and validly opts out of a certified damages class.

66. The Class is sufficiently numerous that joinder is impracticable. Defendants operate a nationally available consumer Website and deploy the challenged architecture through standardized code. The number and identities of affected visitors can be determined from Defendants' consent-management logs, tag-management records, analytics records, vendor records, cookie-consent records, traffic data, and related electronically stored information.

67. Common questions predominate, including whether the Website sends communications to HubSpot, Adobe, Google/DoubleClick, and related recipients after rejection; whether those transmissions occur contemporaneously; what fields are transmitted; whether those fields constitute contents or meaning; whether the recipients act as independent third parties; whether Defendants caused or procured the acquisition; whether the consent interface creates authorization; whether the conduct is highly offensive; whether Defendants' sale, sharing, and data-broker use is independently tortious; and whether classwide injunctive and monetary relief is appropriate.

68. Plaintiff's claims are typical because they arise from the same standardized Website, the same consent interface, the same tracking architecture, and the same course of conduct affecting other Class members. Plaintiff rejected non-essential tracking and continued to browse, yet the challenged architecture continued commercial third-party acquisition.

69. Plaintiff will fairly and adequately protect the interests of the Class. She has no conflict with absent Class members and has retained counsel experienced in privacy, consumer-protection, and class-action litigation.

70. A class action is superior because individual recoveries are unlikely to justify separate litigation over technically complex browser-side surveillance; Defendants possess the relevant configuration and vendor evidence; common technical proof can establish the operation of the standardized Website; and class treatment will promote consistent adjudication and judicial economy.

## VI. <u>CAUSE OF ACTION</u>

## <u>FIRST CAUSE OF ACTION</u>

### Violation of California Invasion of Privacy Act — Penal Code § 631(a)

71. Plaintiff incorporates all preceding allegations as though fully set forth herein.

72. Penal Code section 631(a) prohibits, among other things, intentionally tapping or making an unauthorized connection with a communication line; willfully reading, attempting to read, or learning the contents or meaning of a communication while it is in transit without the consent of all parties; and aiding, agreeing with, employing, or conspiring with another person to do those acts.

73. Plaintiff's browser communications with the Website are communications carried over electronic communication lines and systems. They include requests for specific pages, services, offer flows, search or form information, URLs, query strings, referrers, and associated interaction information.

74. Defendants intentionally embedded and configured third-party code that causes visitors' browsers to create additional connections and transmissions to independent commercial recipients, including HubSpot, Adobe, Google/DoubleClick, and related advertising and data partners.

75. Those recipients acquire the contents and meaning of the communications contemporaneously while the Website interaction is in transit. The report demonstrates

real-time HTTP requests carrying page URLs and user-entered information, together with persistent identifiers, session information, browser and device information, and related contextual data.

76. Defendants at minimum aid, agree with, employ, and procure the outside recipients' acquisition by selecting and embedding the relevant code, configuring the integrations, supplying the data fields, causing the browser requests, and receiving commercial value from the resulting tracking, profiling, measurement, and remarketing.

77. Plaintiff and Class members did not consent. The challenged conduct begins before effective consent and materially continues after visitors affirmatively reject non-essential tracking. An express rejection is the opposite of consent.

78. The Website's consent banner further precludes any contention that visitors implicitly authorized the conduct merely by continuing to browse. Defendants specifically offered a mechanism to refuse non-essential tracking, recorded the refusal, and then failed to honor it.

79. As a direct result, Plaintiff and Class members suffered loss of privacy, unwanted disclosure of communications, loss of control over personal information, and statutory injury. Plaintiff seeks all relief available under Penal Code section 637.2, including statutory damages, actual damages where proven, injunctive relief, and other appropriate relief.

## SECOND CAUSE OF ACTION

### Violation of the Electronic Communications Privacy Act — 18 U.S.C. §§ 2510 et seq. and 2520

80. Plaintiff incorporates all preceding allegations as though fully set forth herein.

81. The Website communications at issue are electronic communications within the meaning of 18 U.S.C. § 2510. Defendants intentionally intercepted, endeavored to intercept, and procured others to intercept those communications through browser-side code that contemporaneously acquires them as they are transmitted.

82. HubSpot, Adobe, Google/DoubleClick, and associated advertising, analytics, audience-management, and data partners receive their own network requests at their own endpoints while the Website interaction occurs. The interception is therefore contemporaneous and not merely later access to stored communications.

83. Defendants also intentionally disclosed and used, and procured others to disclose and use, information obtained through the interception for advertising attribution, profiling, audience building, retargeting, personalization, data synchronization, sale, sharing, analytics, and related commercial purposes.

84. Plaintiff did not consent to the interception, disclosure, or use. She affirmatively rejected non-essential tracking. The relevant outside recipients are not parties to Plaintiff's direct request for Constellation energy information merely because Defendants embedded their code into the Website.

85. In any event, any party-consent exception is unavailable because Defendants intercepted and procured interception for the purpose of committing independently tortious acts. Those independent purposes include intentionally invading Plaintiff's privacy and seclusion after an express rejection; deceptively inducing continued communications through a privacy choice Defendants did not honor; and selling, sharing, disclosing, or otherwise commercially distributing intercepted visitor information to advertising networks, analytics providers, data partners, and data-broker systems for profiling, cross-site tracking, retargeting, and monetization.

86. The independently tortious purpose is separate from the interception itself. The interception obtains the communication; the later sale, sharing, profile enrichment, audience matching, cross-site synchronization, and retargeting exploit the communication for additional commercial ends. Defendants' own disclosures acknowledge sale or sharing of identifiers, unique personal identifiers, and geolocation-related information to advertising networks and data-analytics providers, while the technical report documents the long-lived IDs and data-partner architecture used to accomplish that exploitation.

87. Defendants acted intentionally and for commercial benefit. Plaintiff and the ECPA Subclass are persons whose communications were intercepted, disclosed, or intentionally used in violation of ECPA and are entitled to relief under 18 U.S.C. § 2520, including statutory or actual damages as provided by law, punitive damages where warranted, equitable and declaratory relief, and reasonable attorneys' fees and litigation costs.

**THIRD CAUSE OF ACTION**

**Intrusion Upon Seclusion**

88. Plaintiff incorporates all preceding allegations as though fully set forth herein.

89. Plaintiff and Class members had a legally protected privacy interest in the contents and context of their Website communications and in deciding whether independent advertising, analytics, and data-broker entities could receive, persistently identify, profile, sell, share, or exploit those communications.

90. Plaintiff had a reasonable expectation of privacy against the challenged conduct because Defendants affirmatively presented a privacy interface allowing her to reject non-essential tracking and she exercised that choice. A reasonable visitor who selects "Reject All" does not expect that the Website will continue sending her activity to remarketing, audience-management, advertising, and data-broker systems.

91. Defendants intentionally intruded into Plaintiff's private affairs by deploying code that secretly duplicated and transmitted Website communications to independent third parties, associated those communications with persistent identifiers, permitted cross-session and cross-site recognition, and enabled the resulting information to be sold, shared, profiled, synchronized, and used for behavioral advertising.

92. The intrusion would be highly offensive to a reasonable person. It occurred after an express refusal, concerned the substance of what Plaintiff sought and viewed, was invisible to an ordinary user, used persistent IDs capable of linking multiple interactions,

and served commercial advertising and data-monetization purposes rather than any necessity of delivering the requested Website content.

93. The offensiveness is heightened by the false privacy choice. Defendants did not merely fail to mention an obscure technical detail. They expressly asked whether Plaintiff wanted non-essential tracking, recorded her rejection, and then continued the very tracking she refused. A consent mechanism that does not honor rejection turns a purported privacy safeguard into a means of inducing communications under false pretenses.

94. Plaintiff suffered loss of privacy, loss of control over her communications and personal information, unwanted disclosure, disturbance and offense upon learning of the conduct, and the exposure of her Website activity to persistent commercial profiling and retargeting systems. Plaintiff seeks compensatory, nominal, punitive, injunctive, declaratory, and other relief available by law.

## FOURTH CAUSE OF ACTION

### Violation of California Constitution, Article I, § 1 — Right to Privacy

95. Plaintiff incorporates all preceding allegations as though fully set forth herein.

96. Article I, section 1 of the California Constitution protects the inalienable right of privacy. Plaintiff and Class members possessed a legally protected privacy interest in the content, context, and dissemination of their online communications and in controlling whether their Website activity would be disclosed to independent advertising, analytics, audience-management, and data-broker entities.

97. Plaintiff had a reasonable expectation of privacy because Defendants themselves provided a mechanism to reject non-essential tracking and Plaintiff used it. Her expectation was not that Constellation would cease all technical processing necessary to deliver a webpage. It was that non-essential advertising, retargeting, profiling, and data-broker recipients would not continue receiving and exploiting her communications after she affirmatively rejected those categories.

98. Defendants committed a serious invasion of that privacy interest by causing the contemporaneous transmission of Website communications to outside entities, associating those communications with long-lived advertising identifiers, enabling behavioral profiles and cross-site tracking, and selling or sharing categories of visitor information to advertising and analytics recipients despite the visitor's contrary privacy choice.

99. The invasion is serious because it is systematic, concealed from ordinary users, commercially motivated, persistent across sessions, capable of revealing the substance of Website activity and user-entered information, and undertaken after an express refusal. The long-lived identifiers and audience-management systems transform individual page interactions into durable behavioral records.

100. Defendants' conduct caused Plaintiff and Class members injury, including loss of privacy and control over personal information, unauthorized disclosure and dissemination, unwanted commercial profiling, and exposure to retargeted advertising and other downstream uses. Plaintiff seeks damages and appropriate declaratory and injunctive relief to remedy and prevent continuing constitutional privacy violations.

/ / /

/ / /

## PRAYER FOR RELIEF

a. For an order certifying the proposed Class and ECPA Subclass, appointing Plaintiff as Class Representative, and appointing undersigned counsel as Class Counsel;
b. For statutory damages under California Penal Code section 637.2 and all statutory and actual damages available under 18 U.S.C. § 2520;
c. For compensatory, nominal, and punitive damages to the extent authorized and proven;

d. For declaratory and injunctive relief requiring Defendants to cease unlawful post-rejection interception, disclosure, sale, sharing, and data-broker use and to honor visitors' privacy choices;

e. For reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest where authorized by law; and

f. For such other and further relief as the Court deems just and proper.

Dated: September 16, 2026

PACIFIC TRIAL ATTORNEYS, APC

By: *\/s/ Scott J. Ferrell*
Scott J. Ferrell
Attorneys for Plaintiff and the Proposed Class